2000 UT 5

STATE of Utah, Plaintiff and Appellee,

v.

Beau HEAPS, Defendant and Appellant.

No. 980197.

Supreme Court of Utah.

Jan. 11, 2000.

Jan Graham, Att'y Gen., J. Frederic Voros, Jr., Asst. Att'y Gen., Salt Lake City, and James R. Taylor, John L. Allan, Provo, for plaintiff.

Jon D. Williams, David C. Cundick, Salt Lake City, for defendant.

HOWE, Chief Justice:

¶ 1 Defendant Beau Heaps appeals from a conviction for murder, a first degree felony, in violation of Utah Code Ann. § 76–5–203 (Supp.1996). He contends that the jury poll indicated a nonunanimous jury, and assigns as error the trial court's failure to either declare a mistrial or require further deliberations. He also argues that the evidence presented at trial was insufficient to support the verdict.

## BACKGROUND

¶ 2 When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. *See State v. Gordon,* 913 P.2d 350, 351 (Utah 1996). We present conflicting evidence only when necessary to understand issues raised on appeal. *See State v. Dunn,* 850 P.2d 1201, 1206 (Utah 1993).

¶ 3 On several occasions in the weeks preceding his murder, John Freitag, the victim in this case, and his family received threats of bodily harm from Heaps, including one left on Freitag's telephone answering machine. Heaps later admitted to friends that leaving the threat on an answering machine was "dumb." He excused his error in judgment by laughing and stating that he was drunk at a party when he left the message.

¶ 4 Heaps also told acquaintances that he was going to kill Freitag. On one occasion, after arguing with Freitag on the telephone, Heaps told a mutual friend, Tiana Heard, to "[t]ell John that he's dead. I'm going to blast him." Heard testified that Heaps told her that Freitag was a dead man, and that Heaps was going to hurt and "take care of" Freitag. Heard further testified that for two weeks prior to the murder, every time she saw Heaps he was threatening Freitag, often saying, "He's a nark. Nobody narks on me. Nobody gets away with it." [1] Heaps also told Freitag's stepdaughter, Susan Rice, [2] on at least one occasion that he was going to "cap" Freitag. [3]

¶ 5 On the evening of the murder, Heaps attended a party at Heard's house in Provo, Utah, with six friends: Leikina Lavulavu, Anthony Tai, Tonga Mounga, David Niumeitolu, Bo Malupo, and Topouniua Unga. The group was apparently drinking heavily— some individuals drinking twelve-packs of beer. At one point during the evening, Heaps spoke to Freitag on the telephone. The telephone receiver was then passed in turn to Mounga, Niumeitolu, and Malupo, none of whom knew the person on the telephone, but each of whom exchanged angry words with him. After the telephone call, Niumeitolu, Malupo, and Mounga were "fired up" and "cussing at ... whoever was on the phone," and Heaps said, "I know where he lives. Let's go get this guy." Heaps and his six friends then went to the car, filling the trunk with beer from the party.

¶ 6 Heaps, the only one in the car who knew where Freitag lived, directed Lavulavu where to drive, and told the group that Freitag was "psycho," "crazy," and "out of it." Upon reaching Freitag's home in Orem, Utah, at approximately 1 a.m., Lavulavu parked the car some distance away and refused Heaps' request for Lavulavu's gun. Heaps took a BB gun from the car instead and, still cursing and threatening Freitag, hid behind a nearby car. Niumeitolu, Malupo, and Mounga hid by the side of Freitag's house, while Lavulavu and Tai went to the front door. Unga remained near the car and did not approach the house. Tai rang the doorbell. When Freitag answered, Tai asked if Susan Rice was at home; Freitag responded that she was not there. Malupo, Niumeitolu, and Mounga then walked to the front porch from the side of the house. Through the front window, Malupo saw Freitag with what he thought was a gun and told the others in Tongan that Freitag had a gun. Tai, Niumeitolu, Malupo, and Mounga fled; Lavulavu pulled out his gun. Lavulavu, pointing his gun at Freitag, asked in Tongan, "Should I shoot him?" Lavulavu heard the response, "Shoot," and he pulled the trigger, fatally shooting Freitag in the abdomen.

¶ 7 Lavulavu testified under oath that he could not remember whether the response

---

1. According to Officer Gordon Smith, who testified at trial, "nark" is a slang term meaning a confidential informant, specifically one who gives the police information about narcotics dealings, stolen property, or other illegal activity. Apparently, Heaps was correct in his assumption that Freitag was a "nark." Less than two weeks prior to his murder, Freitag signed an agreement to work in conjunction with the Utah County Narcotics Enforcement Team.

2. Freitag once had a relationship with Rice's mother, but they had since separated. While not legally Rice's stepfather, she considered him as such and, because of difficulties with her mother, was living at Freitag's home at the time of the murder.

3. According to Officer Smith, "cap" is a slang term meaning to shoot someone.

was in English or in Tongan, but on cross-examination said he thought it was probably in English. He testified that when faced with a frightening or exciting circumstance, he expected his Tongan friends to speak in Tongan. On the other hand, Heaps apparently does not speak Tongan well, nor would he understand a complicated question such as Lavulavu asked. Of the five other Tongans, Niumeitolu, Mounga, and Malupo all denied having told Lavulavu to shoot; Tai did not hear a response to Lavulavu's question, and Unga was still back at the car.

¶ 8 Immediately following the shooting, the group returned to the car and left the scene, but were stopped by police officers. While still in the car, Heaps told the others "[j]ust to blame it on him, that he was the one who did it." As the officers were bringing the seven out of the car, Heaps was heard to say, in essence, not to say anything to the police. The officers transported the group to the Orem jail facility. Samples taken at the jail facility showed only two particles of gunshot residue on Heaps' hands and two particles on Lavulavu's clothing.[4] None of the other suspects' samples showed any gunshot residue.

¶ 9 At the conclusion of a four-day trial, the jury found Heaps guilty of murder, a first degree felony, in violation of Utah Code Ann. § 76-5-203. Heaps then accepted the trial court's offer to poll the jury, as allowed by Utah Rule of Criminal Procedure 21(f). The court clerk asked each of the jurors, in succession, "Was this and is this your verdict?" The first five jurors polled answered with "Yes." The sixth juror answered, "No," paused, and then said, "I conceded." The trial court responded: "Well, it's necessary, as indicated, that all of your decisions in order to be binding[,] be unanimous, and therefore, if this is not your verdict, then we need to have you continue to deliberate until you can reach a verdict." The juror ("Juror Six") then said "Yes," to which the trial court

asked, "It is your verdict?" Juror Six nodded her head in response. The court clerk then continued polling the remaining jury members. Following the jury polling, the trial court asked counsel if there was anything further, to which Heaps' attorney responded, "Nothing at this time." Heaps now appeals, urging this court to reverse his conviction.

## ANALYSIS

¶ 10 Heaps assigns as error the trial court's failure following the jury polling to either send the jury back for further deliberations or declare a mistrial as required by Utah Rule of Criminal Procedure 21(f). He contends the trial court thereby violated his right to a unanimous jury verdict in a criminal trial guaranteed under article I, section 10 of the Utah Constitution[5] and Utah Rule of Criminal Procedure 21(b).[6] He also asserts that the evidence presented by the State was insufficient to establish guilt beyond a reasonable doubt.

### I. JURY POLLING

¶ 11 Utah Rule of Criminal Procedure 21(f) reads:

> When a verdict is returned and before it is recorded, the jury shall be polled at the request of any party or may be polled at the court's own instance. If, upon the poll, there is no unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged. If the verdict is unanimous, it shall be recorded.

This court has addressed the procedural aspects of jury polling once before, but only cursorily. *See State v. Russell,* 733 P.2d 162 (Utah 1987). Our analysis, therefore, relies on other jurisdictions for guidance.

---

4. Gunshot residue is typically emitted from the muzzle and sides of a weapon when it is fired, often enveloping the shooter's hand in a cloud of gases. One expert testified at trial that a person on whom gunshot residue is found has most likely "fired a weapon or been near someone who has." However, because gunshot residue is a fine powder, it could conceivably be transferred from a shooter to someone else.

5. Article I, section 10 reads in pertinent part: "In criminal cases the verdict shall be unanimous."

6. Utah Rule of Criminal Procedure 21(b) provides in pertinent part: "The verdict shall be unanimous."

¶ 12 The purpose of jury polling is to "determine that the verdict signed by the foreman is that of the individual jurors and not one that has been coerced or caused by mistake." *Russell*, 733 P.2d at 164 (citing *State v. Agtuca*, 12 Wash.App. 402, 529 P.2d 1159 (1974)); *accord* 21A Am.Jur.2d *Criminal Law* § 1294 (1998). Appellate review of a trial court's actions in polling a jury is a two-fold process, involving both a question of fact and of law. First, we review as a factual question the trial court's determination concerning unanimity on a clearly erroneous standard, granting some deference to the trial judge, because a "trial judge, in determining whether a juror has freely assented to the verdict, not only hears the juror's response, but observes the juror's demeanor and tone of voice during the course of the polling of the jury." *People v. Cabrera*, 116 Ill.2d 474, 108 Ill.Dec. 397, 508 N.E.2d 708, 714 (1987); *see also United States v. Luciano*, 734 F.2d 68, 70 (1st Cir.1984) (holding that deference is due trial court's determination regarding juror's ultimate assent to the verdict because of trial judge's nearness to the proceedings (citing *Amos v. United States*, 496 F.2d 1269, 1273 (8th Cir.1974))); *Sincox v. United States*, 571 F.2d 876, 879 (5th Cir.1978) (stating that the trial judge "is in the best position to be aware of whatever happens" during jury poll); *Amos v. United States*, 496 F.2d 1269, 1272 (8th Cir.1974) (holding that Federal Rule of Criminal Procedure 31(d), "grants the trial judge a measure of discretion in determining either to require the jury to deliberate further or to grant a mistrial if it appears that the verdict was not unanimous"); [7] M.J. Greene, Annotation, *Juror's Reluctant, Equivocal, or Conditional Assent to Verdict, on Polling, as Ground for Mistrial or New Trial in Criminal Case*, 25 A.L.R.3d 1149, 1151–52 (1969) (noting that juror's attitude toward verdict "must be determined by the trial judge not only from the exact words used by the juror, but from all the circumstances, including the juror's expression and demeanor" and without extraordinary evidence to the contrary, "the determination of the trial judge will not

be disturbed on appeal"). Second, we review as a question of law, using a correctness standard, whether the trial court erred in not either returning the jury for further deliberation or declaring a mistrial. *See Morris v. Health Net*, 988 P.2d 940, 941 (Utah 1999).

¶ 13 A criminal defendant's right to poll the jury is a corollary to the defendant's right to a unanimous verdict. *See* 21A Am. Jur.2d *Criminal Law* § 1293 (1998). For a unanimous verdict, then, each juror must answer in the affirmative, expressing his or her agreement with the verdict. While polling the jury, the trial court must not engage in either coercive or intimidating conduct, such as *requiring* jurors' acquiescence to the verdict or extensive in-court interrogation of a dissenting juror. *See, e.g., Jones v. United States*, 273 A.2d 842, 844–45 (D.C.1971) (stating that trial judge's repeated efforts to obtain unanimous verdict upon jury polling, including extended questioning of dissenting juror, may have had coercive effect upon dissenting juror); *Brutton v. State*, 632 So.2d 1080, 1083 (Fla.Dist.Ct.App.1994) (stating that court's interrogation of dissenting juror in front of jury created impression that juror lacked right to change vote and led to intimidating situation causing juror to capitulate to verdict); *State v. Ware*, 498 N.W.2d 454, 459 (Minn.1993) (holding that repeated questioning of juror about assent to verdict could be coercive or intimidating).

¶ 14 Heaps argues that a trial court has no choice but to either send a jury back for further deliberations or declare a mistrial when a juror unequivocally disagrees with the stated verdict. We agree with this assertion. This is the remedy mandated by rule 21. However, that is not the case before us.

¶ 15 Heaps characterizes Juror Six's answer as an "emphatic[ ] 'NO' when asked if the verdict was her true verdict." However, Heaps errs in portraying the juror's answer as unequivocal disagreement with the verdict. The record shows that Juror Six's full response was "No. I conceded." Her response was not an emphatic "no"; instead,

---

7. Federal Rule of Criminal Procedure 31(d) is identical to Utah Rule of Criminal Procedure

21(f).

her response was closer to an attempt on her part to explain the reasoning behind her vote, or perhaps indicating a degree of reluctance about the verdict, rather than outright disagreement with the verdict. When a juror's answer is equivocal or ambiguous, a trial court must take steps to ascertain the unanimity—or lack thereof—among the jurors.[8]

¶ 16 "In any case upon the appearance of any uncertainty or contingency in a jury's verdict *it is the duty of the trial judge to resolve that doubt,* for 'there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination.' " *United States v. Hernandez–Garcia,* 901 F.2d 875, 878 (10th Cir.1990) (emphasis added) (quoting *United States v. Morris,* 612 F.2d 483, 489 (10th Cir.1979); *Cook v. United States,* 379 F.2d 966, 970 (5th Cir.1967)). To that end, "where a juror when polled gives an uncertain or equivocal answer, it would seem that before discharging the jury or directing it to resume its deliberations, a district judge should first attempt to clear up the uncertainty." *Id.* Also, "where [a] juror indicates merely some degree of reluctance or reservation about the verdict, the proper course of action depends largely upon the discretion of the trial judge." Greene, Annotation, *supra* ¶ 12, at 1151. To obtain a juror's ultimate assent to the verdict, "a trial court must be accorded some latitude in questioning a juror in order to clarify any confusion arising out of the polling of the jury." *Ware,* 498 N.W.2d at 459. We acknowledge that a trial court may go too far in questioning a juror; trial courts must be wary in these circumstances, questioning jurors in a nonconfrontational manner. "It is 'both unwise and undesirable that the court should enter into an argument with the juror or require an explanation of his change in position.' " *Brutton,* 632 So.2d at 1083 (quoting *United States v. Sexton,* 456 F.2d 961, 966 (5th Cir.1972)).

¶ 17 As early as 1888, the Georgia Supreme Court held that if a juror agreed to a verdict, that was sufficient; the law does not "inquire as to the degree of reluctance or willingness with which a juror's mind assents to the verdict. Its only inquiry is, does [the juror] agree to it?" *Parker v. State,* 81 Ga. 332, 6 S.E. 600, 601 (1888); *see also Young v. State,* 239 Ga. 53, 236 S.E.2d 1, 5 (1977)(stating that juror's "indication of 'reservations' does not prevent the verdict from being unanimous. The requirement is that a juror agree to a verdict."). Furthermore, as this court has previously held: "All inquiries into the mental processes of the jury are improper." *Russell,* 733 P.2d at 164. At the point that polling becomes an attempt to reach the jurors' thought processes, the questioning is impermissible. *See id.* at 165. Therefore, absent coercion by either other jurors or the trial court, a juror's ultimate assent to the verdict cannot be considered as adequate grounds for a reversal. *See* Greene, Annotation, *supra* ¶ 12, at 1152, 1156–59.

¶ 18 Heaps maintains that the trial court "interrogated" Juror Six "until she changed her answer to 'yes.' " We reject this portrayal of the trial court's actions. "There is a distinction between the conduct of a trial judge who attempts to obtain clarity and that of a trial judge who attempts to coerce a final verdict, even if that verdict is not the product of free choice by each of the jurors." *United States v. Duke,* 527 F.2d 386, 394 (5th Cir.1976). Here, the trial court was simply attempting to clarify Juror Six's vote. There was no coercion, no interrogation; the trial court merely stated its procedural responsibility in the event of a non-unanimous verdict. Upon Heaps' filing of a motion to arrest judgment based on the perceived error in the jury polling, the trial court reviewed its actions. Upon review, the trial court indicated that "based on [Juror Six's] answers, demeanor and tone of voice the court was convinced of her voluntary assent to the verdict and continued with the

---

8. Courts are split in their treatment of jurors who, during the polling, either give equivocal, ambiguous, inconsistent, or evasive answers as to whether they assent to the verdict, or give answers that indicate a reluctant or conditional assent to the verdict. *See generally* Greene, Annotation, *supra* ¶ 12. We follow the line of cases that we find most persuasive and that most closely resembles the laws of this jurisdiction.

polling." We do not find the trial court's actions to be clearly erroneous. Therefore, we uphold its finding that Juror Six ultimately assented, absent coercion or interrogation, to the verdict. Furthermore, we hold that the trial court, having received Juror Six's assent, correctly continued the jury polling and attained a unanimous verdict. Thus, we reject Heaps' first assignment of error.

## II. SUFFICIENCY OF THE EVIDENCE

¶ 19 When reviewing a jury verdict on an insufficiency of the evidence argument, we view the evidence and all inferences drawn therefrom in a light most favorable to the verdict. *See Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998). We will reverse a jury verdict only when, after viewing the evidence and all inferences drawn therefrom in a light most favorable to the verdict, we find that "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Id.* (internal quotations omitted). So long as some evidence and reasonable inferences support the jury's findings, we will not disturb them. *See id.* After an extensive examination of both the record and counsels' arguments, we must conclude that the evidence was sufficient to warrant the jury's guilty verdict.

¶ 20 Heaps raises two main objections to the evidence. He first takes issue with the question of language. Lavulavu used Tongan when he asked whether he should shoot; several witnesses maintain that Heaps was not proficient in Tongan and would neither understand the question nor be able to respond to it. However, Lavulavu's stance with the gun—arm and gun outstretched toward Freitag—and the emotion of the moment could lead the jury to believe that Heaps reasonably could have understood Lavulavu's meaning, if not the exact words. Furthermore, with the dislike he had for Freitag and the desire to see Freitag "taken care of," even if he *had not* understood Lavulavu's body language, he reasonably could have been urging Lavulavu to go ahead and shoot, not knowing that Lavulavu had just asked that very question.

¶ 21 Heaps also disputes the jury's finding that he had, in fact, been the one urging Lavulavu to shoot. Lavulavu testified that he could not remember whether "shoot" was said in English or in Tongan, but on cross-examination felt that "maybe it was in English." As Lavulavu testified, under the emotion of the moment, Heaps was the only one likely to speak in English. There was no evidence that any of the Tongans had any reason to harm Freitag or that they even knew him. Malupo, Mounga, and Niumeitolu all denied, under oath, that they had told Lavulavu to fire. Tai did not hear a response, and Unga was still at the car. Of the group, only Lavulavu and Heaps did not flee before Lavulavu fired.

¶ 22 Heaps' second objection is that Tai, Unga, and Malupo all testified that "Heaps never mentioned anything about committing violence against the victim as the group ... left the party and drove to the victim's house," arguing also that the evidence showed that he "was a big talker but has never carried through with any threats." He further asserts that the "evidence presented *clearly* shows that Heaps did not intend to commit any violence against the victim on the night he was killed." These arguments fall short of raising reasonable doubt. Heaps repeatedly uttered threats against Freitag to his acquaintances. At the party on the night of the murder, he worked his Tongan friends into a frenzy, then when others said, "Let's go kick his [Freitag's] ass," Heaps responded that he knew where Freitag lived and said, "Let's go get this guy," telling the group that Freitag was "psycho" and "crazy." Heaps asked for Lavulavu's gun when they were leaving the car. The mere fact that Heaps may not have expressly advocated violence against Freitag while en route is insufficient to create reasonable doubt.

¶ 23 Based on all the evidence presented, including the gunshot residue evidence, the jury concluded that Heaps "solicited, requested, commanded, encouraged, or aided another person to cause the death of John Freitag." We therefore conclude there was sufficient evidence to uphold the verdict.

## CONCLUSION

¶ 24 Based upon the foregoing analysis, we hold that the trial court did not err in conducting the jury polling in the manner that it did. We further hold that the trial court correctly attained a unanimous verdict from the jury. Finally, we find the evidence presented to be sufficient to uphold the jury's verdict. Accordingly, we reject Heaps' arguments on appeal; Heaps' conviction is therefore affirmed.

¶ 25 Associate Chief Justice DURHAM and Justice RUSSON concur in Chief Justice HOWE's opinion.

¶ 26 Justice STEWART and Justice ZIMMERMAN concur in the result.